IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT KOPPERUD,

            Plaintiff,

    v.                                          1:12-cv-3503-WSD

DEXTER MABRY, in his individual
capacity, and DAMIEN BUTLER, in
his individual capacity,

            Defendants.

## OPINION AND ORDER

This matter is before the Court on Defendants Dexter Mabry and Damien Butler's Motion for Summary Judgment [51] and on the parties' Consolidated Consent Motion for Limited Discovery [50].

## I.    BACKGROUND

### A.    Procedural History

On October 8, 2012, Plaintiff Robert Kopperud ("Kopperud") filed this action under 28 U.S.C. § 1983 against Dexter Mabry ("Mabry") and Damien Butler ("Butler") in their individual capacities. Mabry and Butler are deputies in the Fulton County, Georgia, Sheriff's Office. On November 18, 2012, Kopperud

filed an Amended Complaint asserting the following claims: (i) excessive use of force, brought under Section 1983 (asserted against Butler) (Count I); (ii) false arrest, brought under Section 1983 (asserted against Mabry and Butler) (Count II); (iii) assault and battery, brought under state law (against Mabry and Butler) (Count III); (iv) false imprisonment, brought under state law (against Mabry) (Count IV); (v) failure to intervene, brought under Section 1983 (against Mabry) (Count V); (vi) punitive damages (against Mabry and Butler) (Count VI); and (vii) attorneys' fees, under Section 1988 (against Mabry and Butler) (Count VII).[1]  These claims are based on events involving Kopperud's arrest on October 9, 2010.

B.    <u>Facts</u>

On October 8, 2010, Kopperud was arrested in Sandy Springs, Georgia, when he attempted to fill a prescription for pain medication.[2]  Kopperud was taken to the Fulton County Jail (the "Jail") and released on October 9, 2010.  After his release, Kopperud called his mother from the Jail lobby to ask her to pick him up and take him home.  The parties dispute what happened after Kopperud entered the

---

[1] Plaintiff also asserted, but then abandoned:  a state-law false arrest claim against Mabry and Butler; a state-law false imprisonment claim against Butler; and, under Section 1983, a failure to intervene claim against Butler.  (Pff.'s Resp. to Defs.' Mot. for Summ. J. at 27 n.3.)

[2] It appears that the pharmacist suspected Kopperud of obtaining multiple prescriptions from different doctors.  Kopperud was not prosecuted.

lobby to call his mother.  It is undisputed, however, that Deputy Mabry was on duty in the Jail lobby and, at some point, told Kopperud to leave.  At some point later, when Kopperud was outside in the Jail parking lot, Mabry called the Jail's Special Operations Response Team ("SORT") and Kopperud was arrested and taken to a "receiving room" in the Jail, where he was searched by Deputy Butler.  During the course of the search, Kopperud suffered a cut above his eye when, apparently, his forehead was pushed against a plexiglass wall.  Kopperud was taken to Grady Memorial Hospital, where he received four stitches to close the cut.  After treatment, Kopperud was released from custody from the hospital.  He was not prosecuted.

Because the parties dispute various details of the events leading up to and following Kopperud's arrest, the Court examines separately Kopperud's, Mabry's, and Butler's accounts of what occurred.[3]

---

[3] On summary judgment, the Court construes the facts in the light most favorable to Kopperud, the party opposing the motion.  See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc., 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party) (citation omitted).  The Court concludes it is necessary to compare the parties' differing versions of events to determine if there is a dispute of fact or facts that impacts whether the Court can find that no reasonable juror could find for the Plaintiff based on the facts presented by the parties.

### 1.   *Kopperud's interactions with Deputy Mabry*

Kopperud's version of events is offered in the Amended Complaint and in his March 22, 2013, deposition testimony.  Mabry's version is offered in three (3) different sources: (i) an incident report completed on October 9, 2010, the date of Kopperud's arrest; (ii) an audio-recorded interview conducted by the Fulton County Office of Professional Standards ("OPS") on August 29, 2011; and (iii) Mabry's deposition, conducted on June 21, 2013.  Finally, Kopperud's interactions with Mabry in and outside the Jail on October 9, 2010, were captured by video surveillance cameras in the lobby, entrance, and parking lot (the "Video Surveillance").

### i.   *Kopperud's account of the events on October 9, 2010*

Kopperud was in the Jail lobby speaking to his mother on the phone, attempting to arrange a ride home.  Mabry told Kopperud there was a two-minute time limit on using the phone, that the limit had expired, and that Kopperud needed to get off the phone.  Kopperud concluded his call, and sat down in the lobby to wait his turn until the phone was again available.  A short time later, Kopperud again used the phone to try to contact his mother.  After hanging up, Kopperud complained to Mabry about being told to get off the phone, and stated that Mabry's

conduct and language was unnecessary.[4]  (Kopperud Dep. at 30; Am. Compl. ¶ 9.)

Mabry became upset and ordered Kopperud to leave.  (Id.; Kopperud Dep. at 25,

27, 31.)

Kopperud walked out of the lobby to the sidewalk in front of the Jail.

(Kopperud Dep. at 31.)  Mabry followed him outside and told him: "Don't let me

catch you outside of here boy or you will find out something."  (Am. Compl. ¶ 10.)

Kopperud responded, "I don't understand why you are doing this to me.  All I

needed to do was use the phone."  (Kopperud Dep. at 32.)  Mabry replied, "Get the

hell out of here."  (Id.)  Mabry appeared to reach for his gun and said, "Let me

catch you on these streets."  (Id.)  Kopperud replied: "This is bullshit," and ran to

where he felt safe, about 20 feet away from Mabry.  (Id. at 33.)

Kopperud walked farther into the parking lot and away from the Jail

entrance.  (Am. Compl. ¶ 11.)  He encountered two people in a red truck who gave

him a cell phone to use to call his mother to make sure she was coming to get him.

(Id.; Kopperud Dep. at 33-34.)  Kopperud vomited in the parking lot.  (Am.

Compl. ¶ 12.)[5]

---

[4] Kopperud does not provide any further information about Mabry's comment.

[5] Kopperud attributed his nausea to not having access to his medication while he
was detained in Jail.

Kopperud sat on the curb in the parking lot and waited for his mother to arrive.  (Kopperud Dep. at 35.)  Two minutes later, Kopperud heard someone yell, "Is that the punk there?" and then heard Mabry say, "Yes, that's him."  (Kopperud Dep. at 36; Am. Compl. ¶ 13.)  Kopperud saw the SORT officers approach, and heard one of them exclaim, "Let's get his ass!"  (Am. Compl. ¶ 13.)  Kopperud responded, "I'm leaving, I do not know what you all want me to do."  He began to walk further into the parking lot and away from the Jail.[6]  (Id. ¶ 14; Kopperud Dep. at 38.)  Kopperud alleges that the SORT team tackled him, kneed him in the back, stretched his arms behind his back, and kneed him in the head.  (Kopperud Dep. at 41-42; Am. Compl. ¶ 14.)  Kopperud was handcuffed and taken back inside the Jail.  While being led back inside, Kopperud asked what he was being charged with and was told: "For being a stupid white boy."  (Am. Compl. ¶ 17.)

---

[6] An agent of the Federal Bureau of Investigation, who conducted an inquiry into Kopperud's allegations, interviewed Deputy Butler, who processed Kopperud after his arrest.  The FBI agent provided, in his summary of his interview with Butler, the following: "Kopperud explained that he got up from the curb and started to walk away from the officers while asking them 'How much farther do you want me to go?'"  (See Butler Dep., Ex. 2, p. 2.)

       *ii.*     *Mabry's accounts of the events on October 9, 2010*

       *a.*     *Mabry's incident report*

Mabry completed an incident report describing the events leading up to Kopperud's arrest on October 9, 2010 (the "Incident Report"). The narrative states, in relevant part:

> Kopperud . . . began yelling on phone and exceeded his two minute limit. I . . . asked him to get off phone so people waiting could use phone. Mr. Kopperud became belligerent and cursing [sic]. I asked him to step outside after he got back on the phone. He walked outside and began cursing me. I ordered him off of the premises. He refused to leave the premises. He walked further into the parking lot and hid beside a car. A patron complained he was hiding near his car. I asked Mr. Kopperud to leave premises several more times he [sic] cursed me and refused to leave premises. I called for assistance. Several officers came to assist me. I [sic] Mr. Kopperud for identification and he started running. We pursued Mr. Kopperud and put him under.

(Mabry's October 9, 2010, Incident Report [Docket No. 55-1].)

       *b.*     *The OPS interview*

On August 29, 2011, the OPS interviewed Mabry. (Docket No. 63, Ex. 3, audio track nos. 1, 2.) Mabry provided to OPS the following account of the events of October 9, 2010:

Mabry was working the security division at the Jail, and was stationed at the magnetometer at the front entrance, where members of the public enter and exit the Jail lobby. Mabry was screening individuals as they entered. While working,

Mabry heard a person cursing while speaking on the phone in the lobby area.[7]

Mabry heard the person using the phone say, "I need my drugs!"  The individual

was speaking loudly enough that Mabry heard him from where he was stationed at

the magnetometer, an area separated from the rest of the lobby by an internal door.

(See Mabry OPS Interview, at the 20:40 minute mark.)  Mabry walked over to the

person on the phone, who he later learned was Kopperud, and told him to lower his

voice.  The female officer at the desk where the phone was located informed

Mabry that she too had told Kopperud to get off the phone, that Kopperud refused,

and was cursing on the phone.

    Mabry told Kopperud to hang up the phone so they could talk.  Kopperud

complied.  Mabry suggested the two walk outside.  Once outside, Mabry reiterated

that Kopperud needed to keep his voice down when using the phone and that he

could not curse while speaking on the lobby phone.  Kopperud responded by

"getting in [Mabry's] face," stating that he "had a right to use the phone."  Mabry

asked Kopperud if he was waiting for money to be released, and Kopperud said

that he was.  At this point, Kopperud began acting "outlandish," and claimed that

someone in the lobby hit him.  Mabry told Kopperud to wait outside, and that when

his money was available, Kopperud could go back inside the building to collect it.

---

[7] Released inmates are permitted to use this lobby phone.

(OPS Interview, at 4:00.)

Kopperud then began yelling, cursing, and threatening Mabry.  Mabry told Kopperud to calm down, and Mabry spent the next three or four minutes trying to calm him.  Mabry ultimately ordered Kopperud to "leave the property."  (Id. at 5:00.)

Kopperud began to walk away, although at one point he stopped someone to ask for cigarettes.  Mabry walked back inside the Jail to return to work, and he informed the female deputy at the desk that Kopperud was gone.  (Id. at 5:30.)

Ten minutes later, a man came into the Jail and told Mabry that a "white guy" in the parking lot was "doing something" to his vehicle.  Mabry went outside and saw Kopperud lying underneath a car.  (Id. at 6:00.)  Mabry asked Kopperud what he was doing, and Kopperud explained that he was looking for his cell phone. Mabry told Kopperud that he needed to get out from underneath the car, although he assisted Kopperud to search for his phone by shining a flashlight under the vehicle.  He did not locate the phone.  Mabry again told Kopperud he needed to "leave the property," and Kopperud said "ok."  (Id. at 6:30.)  Mabry returned to the Jail building.

Mabry later came back outside and again saw Kopperud in the parking lot. Mabry repeated to Kopperud that he needed to leave.  This time, Kopperud "took

9

off running." (Id. at 6:40.)  On four separate occasions Mabry came outside and told Kopperud to leave.  On each occasion, Kopperud ran away.  On the fourth occasion, Mabry called his lieutenant for assistance, stating that Kopperud was tampering with cars in the parking lot.[8]  (Id. at 6:50.)  When the lieutenant arrived in the parking lot, Kopperud again ran away.  (Id. at 7:00.)   Several other deputies pursued and apprehended Kopperud, and Mabry placed him under arrest for failing to leave the premises as ordered.  Mabry then completed the Incident Report.

<em>c.   Mabry's deposition testimony</em>

In his deposition testimony, Mabry described the events on October 9, 2010, as follows:

Mabry was standing at his post at the entrance to the Jail, and was summoned to the main desk in the Jail lobby by the female officers stationed there. (Mabry Dep. at 10.)  These officers asked for Mabry's assistance with Kopperud, who was using the telephone and "causing a ruckus."  (Id. at 9-10.)  Mabry heard Kopperud speaking on the phone in a "loud and abusive manner," immediately approached Kopperud and said, "You cannot use that type of language here, sir.

---

[8] Mabry also stated in the OPS interview that he had received "a number" of complaints that Kopperud was "begging for cigarettes" in the parking lot, and that these complaints, including the complaint that Kopperud was "messing with" a car, prompted Mabry to call for assistance and to have Kopperud arrested.  (Id. at 20:50.)

You have to get off the phone." (Id. at 31.)  Kopperud hung up the phone and

Mabry "escorted [Kopperud] outside to talk with him," for "three to five minutes."

(Id. at 15-17.)  Mabry initially gave Kopperud permission to stand outside the Jail

entrance to "wait on [his] materials."[9] (Id. at 16.)  At some later point, Mabry

"asked [Kopperud] to leave the premises."  (Id. at 15-17.)  Kopperud began

walking toward the exit of the parking lot.  (Id. at 17-18.)  Approximately ten

minutes later, a young African-American male walked in and told Mabry that "a

white guy was out there hiding behind his car and it looked like he was doing

something to his car." (Id. at 19.)  Mabry went back outside to investigate, and

saw Kopperud crouched beside a car in the Jail parking lot.  (Id. at 20.)  Mabry did

not approach the car, but stood "on the sidewalk right near the fire lane at the end

of the walk at the front entrance" of the Jail.  Mabry shined his flashlight at the car,

and identified Kopperud.  (Id. at 21.)  Mabry again confronted Kopperud and told

him to "leave, leave."  Kopperud "took off running."  (Id. at 20.)

     Mabry could not remember how many times he went from the lobby area to

the parking lot to order Kopperud off the premises.  (Id. at 24.)  After telling

Kopperud several times to "leave the premises" and after Kopperud "kept

reappearing in the parking lot," Mabry decided to have Kopperud arrested for

---

[9] The "materials" are not further described.

criminal trespass.  (Id. at 30.)

    *iii.*  *The Video Surveillance*

  There were video cameras in the lobby of, and at the entrance to, the Jail.[10]

The Video Surveillance shows:

  From at least about 18:09 until 18:14 on October 9, 2010, Kopperud used the

phone in the Jail lobby.[11]  At 18:13, Mabry enters the frame and stands, with his

back to Kopperud, a few feet away from where Kopperud is speaking on the

phone.  Standing in this location, Mabry talks to others standing in line waiting to

use the phone.  At 18:13:57, Mabry walks over to Kopperud and raises two

---

[10] Mabry was unaware that there was a video recording of his interactions with Kopperud.  (Mabry Dep. at 39.)  Kopperud's counsel speculates that some video evidence may have been destroyed or was not preserved, despite that counsel sent a spoliation letter to the Fulton County Sherriff requesting all video evidence be preserved as evidence.  The video evidence that was produced does not include coverage of the entire Jail parking lot and one camera, labeled "LD ROOF260," is blacked-out.  (Am. Comp. ¶¶ 27 - 30.)  There is no evidence of video recordings missing or being made unavailable.

[11] This is captured on a camera labeled "LOBBY C8."  The Video Surveillance includes time stamps, in 24-hour format.  The Court does not know whether the camera clocks are synchronized, but a comparison of the recordings and their time stamps indicates the camera clocks are substantially in sync.  There was footage from: the "LOBBY C8" camera, which shows the Jail lobby; the "ENTR LOBC9" camera, which shows Mabry's magnetometer station; the "EntryRF258" camera, which shows a section of the Jail parking lot; and the "PARKING257" camera, which shows the Jail entrance and sidewalk.

fingers.[12]  Immediately after this exchange, at 18:14, Kopperud hangs up.  Mabry casually walks to the far end of the counter.  Kopperud briefly approaches the phone area again, and appears to speak to the person who is now using the phone.  Kopperud exits the camera coverage at 18:14:13.

At 18:18, Kopperud reappears at the counter area in the lobby, and uses the phone.  Mabry, standing less than ten feet away, looks in Kopperud's direction, but does not speak to him or take any action to interfere with his use of the phone.  A short time later, Mabry walks past Kopperud.  At 18:18:52, Kopperud finishes his call.  At 18:19, Kopperud walks out of camera range and a few seconds later, at 18:19:06, a camera shows Kopperud leaving the Jail and walking, alone, on the sidewalk outside the Jail entrance and in front of the Jail parking lot.[13]

Kopperud generally paces along the area in front of the building.[14]  While Kopperud is pacing outside, the interior-view camera in the lobby shows Mabry standing in the lobby.  At 18:19:38, Mabry looks at something outside the building and moves toward the lobby door.  Seconds later, the outside camera shows

---

[12] The time limit for use of the phone is two minutes and this gesture may relate to that limitation.

[13] This is captured on a camera labeled "PARKING257."

[14] His activities are obscured from the camera's view for about twenty seconds, from 18:19:21 until 18:19:45.

Kopperud walking quickly away from the Jail entrance.  At 18:19:55, Mabry appears outside the building walking toward Kopperud.  Three seconds later, at 18:19:58, Mabry signals for Kopperud to stop.  Kopperud and Mabry engage in a very brief exchange, and at 18:20:09, Kopperud walks away from Mabry.  A second later, at 18:20:10, Kopperud is captured by another parking lot camera,[15] running away from Mabry.  Mabry does not pursue Kopperud.  Six seconds later, at 18:20:16, Kopperud stops running and walks out of camera range.  A minute or so later, at 18:21:17, Mabry turns around and walks back inside the Jail.

Twenty seconds later, at 18:21:40, the camera at Mabry's duty station[16] captures Mabry returning to the magnetometer, where he picks up the phone and makes a call.[17]  At 18:26:48, Mabry again appears in the parking lot, now accompanied by five other deputies, three in flak jackets.[18]  These officers fan out into the parking lot.  Moments later they are joined by two more uniformed deputies.  Two minutes later, at 18:28:39, Mabry walks back toward the Jail.  One

---

[15] This camera is labeled "EntryRF258."

[16] This camera is labeled "ENTR LOBC9."

[17] This is the only phone call, shown on the Video Surveillance, made from the magnetometer.

[18] The parties do not dispute that they were the SORT members.

minute later, at 18:29:55, the SORT officers are seen walking toward the Jail, with Kopperud in apparent custody.

2.      *Kopperud's arrest by the SORT officers*

SORT Deputies Burnice Howard, Michael Harris, and James Gates apprehended Kopperud.  In their interviews with OPS, and in their depositions, they stated that they arrested Kopperud because Mabry told them that Kopperud was breaking into cars in the Jail parking lot.  (<u>See also</u> Harris Dep. at 11 - 13; Butler Dep. at 18 - 19.)

3.      *Deputy Butler's search*

When Kopperud was brought back into the Jail by the SORT Deputies, he was in handcuffs and taken to an intake area, where he was placed against a plexiglass wall, and ordered to stand with his legs spread apart.  (Kopperud Dep. at 43.)  Butler first intended to remove Kopperud's handcuffs.  Butler stated he was unable to do so and that Kopperud was moving during the search process.  (Butler Dep. at 10-11.)  Butler stated he used force to keep Kopperud in place during the search.  After this action, Kopperud complied with the search.  Kopperud acknowledges he demanded to know why he had been arrested and with what was he being charged.  He claims he was not actively resisting, but attempted to turn his head to talk to Officer Harris and protest his innocence.  (Kopperud Dep. at 43;

see also Butler Dep. at 10-11.)   Kopperud states that Butler used his forearm to pin

Kopperud's head against the wall and claims he lost consciousness.[19]  (Kopperud

Dep. at 44.)

   Kopperud ultimately was placed in a cell and someone at the Jail noticed

Kopperud's head was bleeding.  He was transferred to the Jail medical unit.  (Id. at

44-45.)  Kopperud testified that Butler and another officer went to the medical unit

room with him, where they laughed at him, and took pictures of him.  (Id. at 45-

46.)  When he was told he needed stitches for his injury, Kopperud refused

treatment from Jail personnel, and was transferred to Grady Hospital.  At Grady,

he was given four stitches, and released to his mother.

   A Federal Bureau of Investigation ("FBI") summary of Butler's interview

with the FBI stated:

> Once in the New Intake area, Deputy [Butler] and Officer [Redacted]
> prepared KOPPERUD to be searched.  Officer [Redacted]
> commanded KOPPERUD to lean forward, place his head on the
> Plexiglass, and spread his feet.  KOPPERUD was noncompliant, as he
> continuously "came off the wall (Plexiglass)."  During the process,
> KOPPERUD stated, "Please let me go; don't put me back in; my mom
> is picking me up; I will leave."  During each statement, KOPPERUD
> "came off the wall."  Officer [Redacted] warned KOPPERUD to
> remain on the wall as he and Deputy [Butler] positioned his body for a
> search of his person.  KOPPERUD still did not comply and came off
> the wall on three (3) to four (4) more occasions.  Deputy [Butler]

---

[19] There is no evidence that Kopperud lost consciousness other than his statement.

> attempted to further assist . . . by commanding KOPPERUD to keep
> his head on the wall, so they could remove his handcuffs and conduct
> a search.  KOPPERUD came off the wall again and Deputy [Butler]
> grabbed the back of KOPPERUD's neck and "placed" [sic]
> KOPPERUD's head on the wall.  After this action by Deputy [Butler]
> KOPPERUD complied and did not come off the wall again.

(Butler Dep. Ex. 1.)[20]  When deposed, Butler disputed the FBI agent's statement

that Butler reported that he "grabbed the back of Kopperud's neck."  (Id. at 8-9.)

Butler testified that he "placed his forearm into Kopperud's back to secure

Kopperud to the wall."  (Butler Dep. at 10-11.)  During the time he secured

Kopperud to the wall, Kopperud was handcuffed with his hands behind his back,

and did not try to escape.  (Id. at 12-13.)  Butler testified that Kopperund "kept

coming off the wall, kept pushing himself off the wall, turning.  And he kept – you

know, turned around telling Officer Harris, I didn't do it, let me go."  (Id. at 14.)

Butler testified that Kopperud used his head to "push off" from the wall because

his hands were cuffed behind his back.[21]  (Id.)

Mabry and Butler move for summary judgment, arguing they are entitled to

qualified immunity from Kopperud's Section 1983 claims.  They also claim they

---

[20] Butler admits that he is the individual referred to as "Deputy [Redacted]."  (See
Butler Dep. at 7-8.)

[21] Kopperud's injury was not noted in the incident report Butler completed after
Kopperud was processed.

are entitled, under Georgia law, to official immunity from Kopperud's state-law claims.

## II.   DISCUSSION

### A.   Legal Standard on Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Parties "asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  Non-moving parties

"need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings." Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but only "to the extent supportable by the record." Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8 (2007)). "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B.    Section 1983 and Qualified Immunity

Section 1983 of Title 42 of the United States Code permits a plaintiff to bring an action in federal court against persons who, under the color of state law, violate the plaintiff's rights under the United States Constitution or federal law.[22]

---

[22] The Court has jurisdiction over Kopperud's Section 1983 claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3). Ortega v. Schramm, 922 F.2d 684, 690 (11th Cir. 1991).

Defendants argue they are entitled to summary judgment on Plaintiff's Section 1983 claims because they are entitled to qualified immunity. "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Wood v. Kesler, 323 F.3d 872, 877 (11th Cir. 2003) (citations and quotations omitted). The framework for analyzing a defense of qualified immunity is well established:

> To be eligible for qualified immunity, the official must first establish that he was performing a "discretionary function" at the time the alleged violation of federal law occurred. Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity. In order to demonstrate that the official is not entitled to qualified immunity, the plaintiff must show two things: (1) that the defendant has committed a constitutional violation and (2) that the constitutional right the defendant violated was "clearly established" at the time he did it.

Crosby, 394 F.3d at 1332. "For purposes of determining qualified immunity, the facts are as alleged and supported by affidavits and deposition testimony, and are taken in the light most favorable to the plaintiff." Bruce v. Beary, 498 F.3d 1232, 1236 n.2 (11th Cir. 2007); Bishop v. Avera, 177 F.3d 1233, 1235 n.2 (11th Cir. 1999) ("In reviewing a summary judgment motion predicated on qualified immunity, the court must resolve all factual disputes in favor of the plaintiff.")

(citing <u>Johnson v. City of Fort Lauderdale</u>, 126 F.3d 1372, 1378 (11th Cir. 1997));

<u>accord</u> <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).

"A right is clearly established if, in light of preexisting law, the unlawfulness of the official's conduct is apparent." <u>Cooper v. Dillon</u>, 403 F.3d 1208, 1220 (11th Cir. 2005).  This standard does not require that the specific conduct in question was previously found to be unlawful; the state of the law need only give an official "fair warning" that his conduct is unlawful.  <u>Id.</u> (citing <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002)).  Qualified immunity therefore "ensure[s] that before they are subjected to suit, officers are on notice their conduct is unlawful."  <u>Id.</u>  "[T]he relevant question on a motion for summary judgment based on a defense of qualified immunity is whether a reasonable official could have believed his or her actions were lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred."  <u>Stewart v. Baldwin County Bd. of Educ.</u>, 908 F.2d 1499, 1503 (11th Cir. 1990).

The parties here do not dispute that Mabry and Butler were acting within their discretionary authority, so the Court considers, on the record before it, whether the Court can find that the undisputed facts show that Kopperud met his burden to demonstrate that Mabry and Butler are not entitled to qualified immunity.  <u>Crosby</u>, 394 F.3d at 1332.

C.   Claim Against Mabry for False Arrest

Kopperud contends that Mabry violated his Fourth Amendment right to be free from "unreasonable searches and seizures."[23]   Under the Fourth Amendment, an arrest is a "seizure" of a person, and whether an arrest is reasonable depends on whether there is probable cause for the arrest.  California v. Hodari D., 499 U.S. 621, 624 (1991); United States v. Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002) (per curium).  "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime."  Floyd, 281 F.3d at 1348.  The probable cause standard is practical and non-technical, and is applied in a specific factual context considering the totality of the circumstances. Skop v. City of Atlanta, Georgia, 485 F.3d 1130, 1137 (11th Cir. 2007) (citing Maryland v. Pringle, 540 U.S. 366, 370 (2003)).

A law enforcement officer may still retain the defense of qualified immunity, however, even if he makes an arrest without probable cause.  "It is inevitable that law enforcement officials will in some cases reasonably but

---

[23] Kopperud also asserts this claim against Butler, but the Complaint does not allege any factual allegations to support that Butler was involved in Kopperud's arrest.  Because Kopperud did not present any evidence that Butler was involved in Kopperud's arrest, the false arrest claim asserted against Butler is required to be dismissed.

mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials . . . should not be held personally liable." Anderson v. Creighton, 483 U.S. 635, 641 (1987).  In the Eleventh Circuit, the standard in such cases is "arguable probable cause," that is, whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002).  Whether an arresting official has probable cause or arguable probable cause depends on the elements of the alleged crime. Crosby v. Monroe, 394 F.3d 1328, 1333 (11th Cir. 2004).

The qualified immunity analysis begins with a fundamental question about the offense for which Kopperud was arrested.  On this threshold issue, the record is conflicted.  The evidence in this case regarding the incident and arrest on October 9, 2010, is based on the accounts given by Kopperud and Mabry, the Video Surveillance, and the testimony of Butler and Harris.  There is no dispute that Kopperud was arrested when he was subdued by deputies other than Mabry in the Jail parking lot.  One of those deputies, Harris, stated that Mabry had informed him that Kopperud was breaking into cars in the Jail parking lot and that it was because of this conduct that Kopperud was placed in custody by Harris and the two deputies he was with.  (Harris Dep. at 11-13; see also Butler Dep. at 18-19.)  The

record facts support that Kopperud was arrested by Harris and other deputies based on Mabry's report that Kopperud was breaking into cars.  Mabry, however, claims in his motion for summary judgment that he had Kopperud arrested for criminal trespass.  This dispute regarding the offense for which Kopperud was arrested is significant and is required to be resolved by a jury.[24, 25]

Assuming criminal trespass was the grounds for Kopperud's arrest, the Court evaluates whether Mabry had arguable probable cause to arrest Kopperud for criminal trespass so as to support a defense of qualified immunity.

---

[24] The parties do not address and the Court does not consider here whether Mabry could be liable for causing Kopperud to be arrested for the offense of breaking into cars or whether Mabry is entitled to qualified immunity for an arrest on those grounds.

[25] The evidence in the record shows that Harris and the other officers arrested Kopperud believing he was breaking into cars.  This belief was based on Mabry's statement that an unidentified person told him there was a white man in the parking lot "doing something" to his car and that Mabry saw Kopperud underneath a car.  At some point after Mabry allegedly received the report that Kopperud was breaking into cars, Mabry is seen on the Video Surveillance making a phone call.  Shortly thereafter, the parking lot camera shows a group of officers moving toward Kopperud and, minutes later, shows Kopperud in apparent custody.  The evidence plausibly supports that Kopperud's arrest was for the suspected offense of breaking into cars in the parking lot.  A jury could well find this was the basis for Kopperud's arrest.

Mabry asserts that he arrested Kopperud for criminal trespass for failing to leave the Fulton County jail after Mabry allegedly told Kopperud to do so.  Under Georgia law, a person commits criminal trespass when he

> knowingly and without authority . . . [r]emains upon the land or premises of another person . . . after receiving, prior to such entry, notice from the owner, rightful occupant, or, upon proper identification, an authorized representative of the owner or rightful occupant to depart.

O.C.G.A. § 16-7-21(b)(3).  To be guilty of criminal trespass, a person must receive proper notice of the premises that he is forbidden to enter or from which he is required to depart.  The Georgia Supreme Court has held:

> Notice is an essential element of the offense of criminal trespass, and must be proven by the state beyond a reasonable doubt at trial. Inherent in the statute's notice provision is a requirement that notice be reasonable under the circumstances, as well as sufficiently explicit to apprise the trespasser what property he is forbidden to enter.

Rayburn v. State, 300 S.E.2d 499, 500 (Ga. 1983).  "Essential to establishment by the state of the offense charged against defendant was a showing that his entry into the [premises] had previously been *expressly* forbidden."  Osborne v. State, 665 S.E.2d 1, 2 (Ga. Ct. App. 2008) (emphasis in original) (citing Scott v. State, 202 S.E.2d 201, 204 (Ga. Ct. App. 1973)).  While Rayburn and Osborn were trespass cases in which a defendant was prohibited to enter specified property,

notice is also required in cases where a person is directed to depart a premises.

O.C.G.A. § 16-7-21(b)(3).

Notice must be sufficient to identify the property the individual is forbidden to enter or remain upon.  Rayburn, 250 Ga. at 657.  In State v. Morehead, 646 S.E.2d 308 (Ga. Ct. App. 2007), a MARTA police officer observed the defendant standing in a pedestrian plaza under the overhang outside the Five Points transit station in downtown Atlanta.  The officer informed the defendant he needed to "leave the property."  Four hours later, the defendant returned to catch a train downstairs inside the transit station, and was arrested for criminal trespass.  The Georgia Court of Appeals affirmed a finding that the officer's notice to "leave the property," given outside the train station, was insufficient to advise the defendant that he could not return to the station to catch a train.  Once sufficient notice is given, a person must leave within a reasonable time under the circumstances.  Reid v. State, 481 S.E.2d 259, 260 (Ga. Ct. App. 1997).

The parties do not dispute that Mabry was authorized to order Kopperud to depart the Jail premises.[26]  The parties also do not dispute that, at some point, Mabry told Kopperud to "leave" and that, when Kopperud was arrested, he was

---

[26] The Court assumes for the purposes of this Order that Mabry had sufficient authority under O.C.G.A. § 16-7-21(b)(3) to order Kopperud to leave the Jail premises.

still on Jail property.  Defendants argue that these facts are sufficient to demonstrate that Mabry had arguable probable cause to arrest Kopperud.

Kopperud argues that Mabry's order to "leave" provided insufficient notice, including by insufficiently identifying the area from which he was required to depart.  Kopperud further argues that no reasonable person under the circumstances here could have determined the property from which Mabry directed Kopperud to depart.

The property on which the Jail building is located is a large tract of land.  An aerial photograph of it is attached to this Order.  The area in which the Jail building and parking lot is located is easily identified physically.[27]  There is, however, a long access road from a main road to get to the Jail building and parking lot.  The record does not show what, if any, features such as signage or property markings, identify this road as part of the Jail property or that it would be reasonable to expect a person to know that the access road and the area between the main road and the Jail building and parking lot were part of the Jail premises.

Mabry states that when he told Kopperud to "leave" the premises, he expected Kopperud to go down the access road to the main road, because that was

---

[27] Although the photograph does not label the Jail or other buildings, it does show a long entry road to the buildings.

what was required for Kopperud to comply with his instruction to "leave the premises." (Mabry Dep. at 24.) What Mabry instructed Kopperud to do is unclear and disputed, even within Mabry's accounts of what he told Kopperud. Mabry testified he initially gave Kopperud permission to stand outside and also testified that he intended to permit Kopperud to remain outside only for the time during which Mabry and Kopperud were speaking. (Mabry Dep. at 17.) He claims ultimately that he told Kopperud to "leave the premises" without any further explanation of the area the premises encompassed. Mabry's claim of his conduct, and the instructions he gave on October 9, 2010, and whether they are sufficient to grant him qualified immunity is further muddled by a comparison of the Video Surveillance to Mabry's and Kopperud's accounts of events. Mabry states he escorted Kopperud outside and spoke with him for up to five minutes. The Video Surveillance shows Kopperud standing alone outside, where he is joined, on one occasion, by Mabry to engage in a less-than-thirty-second exchange. Kopperud testified that when Mabry joined Kopperud outside, Mabry told him to "get the hell out of here." (Kopperud Dep. at 26.) Kopperud testified that he understood this command only to mean walk farther away from the Jail entrance, and to wait for his ride in the parking lot. The Court necessarily concludes the facts on whether Mabry had arguable probable cause to arrest Kopperud for criminal trespass are

significantly disputed.

The Court, construing the facts in a light most favorable to Kopperud, concludes that Kopperud has demonstrated significant disputed issues of fact which preclude the Court finding, at this point in the litigation, that Mabry is entitled to qualified immunity.  First, the facts do not allow the Court to find that Kopperud was arrested for criminal trespass rather than for breaking into vehicles. The offense for which Kopperud was arrested is significantly in dispute.  Second, Kopperud has shown there is an issue of fact regarding whether a reasonable person could believe that Kopperud was given sufficient notice of the property from which he was required to depart.  There are not sufficient facts to show that reasonable officers would have believed that an instruction to "leave the premises" was sufficient.  Third, even if notice was sufficient, it is unclear from the record whether Kopperud was given a reasonable amount of time to comply with Mabry's order.[28]  Thus, Kopperud has shown there is an issue of fact regarding whether

---

[28] The Video Surveillance shows Mabry waited no more than two minutes after Kopperud left his presence before calling to have Kopperud arrested.  The time between Kopperud walking away from Mabry in the parking lot and Mabry turning around to walk back inside the Jail to call the SORT officers, is only sixty seconds. The record is insufficient for the Court to find that Mabry gave Kopperud reasonable time to "leave the premises" before arresting Kopperud for criminal trespass.  See Reid, 481 S.E.2d at 260 (holding that a person lawfully ordered to depart must leave within a reasonable time under the circumstances or is guilty of criminal trespass).

Mabry had arguable probable cause to have Kopperud arrested for criminal trespass, for the same reasons the facts are disputed whether notice was adequate.

Finally, the Court finds there is a fundamental issue regarding Mabry's credibility because of his conflicting accounts of the events of October 9, 2010, their conflict with the accounts given by Kopperud and Harris, and because the Video Surveillance does not support Mabry's testimony on important particulars. Specifically, the Video Surveillance disputes: (i) that Kopperud was creating a ruckus in the lobby; (ii) that Mabry warned Kopperud about his language, ordered him to get off the phone, and escorted him outside; [29] (iii) that Mabry spoke to Kopperud for three to five minutes outside the Jail; (iv) that Mabry ordered Kopperud to "leave the Jail premises" on at least three separate occasions; or (iv) that Mabry received complaints about Kopperud "begging for cigarettes" and "messing with" a car before calling the SORT team.[30]  It is axiomatic that a court

---

[29] The Video Surveillance contradicts Mabry's statement that he immediately approached Kopperud and warned him not to use "loud and abusive" language on the phone, and that Kopperud then became belligerent.  The Video Surveillance shows Mabry standing with his back to Kopperud and does not show that he and Kopperud had an animated conversation.

[30] A jury will have to evaluate and resolve the issue of Mabry's credibility, including by taking into account Harris's deposition testimony that Mabry stated they did not need to be concerned about the FBI investigation into Kopperud's complaint because "Ah, you know it ain't nothing, Harris, man; them guys ain't got no video or nothing; don't worry about that."  (Harris Dep. at 14.)

cannot address issues of witness credibility on summary judgment.  <u>Graham</u>, 193

F.3d at 1282.  These are uniquely reserved for resolution by a jury at trial.

For all of these reasons, Mabry's motion for summary judgment is required

to be denied.

D.    <u>Claim Against Butler for Excessive Use of Force</u>

Kopperud asserts a Section 1983 claim against Butler based on Butler's

alleged excessive use of force that caused injury to Kopperud's forehead after

Kopperud was in custody.  Butler moves to dismiss this claim on the grounds that

he is entitled to qualified immunity.[31]  The analysis required to evaluate excessive

force claims emerges principally from two United States Supreme Court cases:

<u>Whitley v. Albers</u>, 475 U.S. 312 (1986) and <u>Hudson v. McMillian</u>, 503 U.S. 1

(1992).

Excessive force claims are brought based on claimed violations of the Eighth

Amendment, and its prohibition against cruel and unusual punishments.  <u>Whitley</u>,

475 U.S. at 318.  "Not every governmental action affecting the interests of well-

---

[31] To overcome a defense of qualified immunity to a Section 1983 claim of
excessive force, a plaintiff is required to satisfy only the first prong of the qualified
immunity analysis – that is, the plaintiff must demonstrate only that the defendant
violated the Constitution.  <u>Johnson v. Breeden</u>, 280 F.3d 1308, 1321 - 22 (11th Cir.
2002).  The Fourteenth Amendment governs claims arising out of events occurring
while a plaintiff is a pretrial detainee.  <u>See Garrett v. Athens-Clarke County, Ga.</u>,
378 F.3d 1274, 1279 n.11 (11th Cir. 2004).

being or [a person detained] is subject to Eighth Amendment scrutiny." Id. at 319.

"[O]nly the 'unnecessary and wanton infliction of pain' . . . constitutes cruel and

unusual punishment." Id. (citing Ingraham v. Wright, 430 U.S. 651, 670 (1977)).

"It is obduracy and wantonness, not inadvertence or error in good faith, that

characterizes the conduct prohibited by the Cruel and Unusual Punishments

Clause." Id.

A claimant alleging an Eighth Amendment claim thus must "allege and

prove the unnecessary and wanton infliction of pain" which is evaluated "with due

regard for differences in the kind of conduct against which an Eighth Amendment

objection is lodged." Id. at 320.  The evaluation also has to be conducted

considering that the claims arise in institutions where security is a concern.  As the

Whitley court observed in considering a motion to dismiss an Eighth Amendment

excessive force claim:

> Unless it appears that the evidence, viewed in the light most favorable
> to the plaintiff, will support a reliable inference of wantonness in the
> infliction of pain under the standard we have described, the case
> should not go to the jury.

Id. at 322.

The Supreme Court in Hudson further refined the analytical framework for

considering Eighth Amendment excessive force claims.  In Hudson, the Court

addressed "whether the use of excessive physical force . . . may constitute cruel

32

and unusual punishment when the inmate does not suffer serious injury."  503 U.S.

at 4.  In Hudson, correctional officers placed Hudson in handcuffs and shackles,

took him out of his cell and walked him to another area of the institution where,

Hudson claimed, an officer "punched him in the mouth, eyes, chest and stomach

while [another officer] held [Hudson] in place and kicked and punched him from

behind."  Id.  A supervisor watching this encounter told the officers inflicting the

punches and kicks "not to have too much fun."  Id.  As a "result of this episode,

Hudson suffered minor bruises and swelling of his face, mouth and lip . . . and the

blows also loosened his teeth and cracked his partial dental plate."  Id.

The Hudson court[32] began its analysis of Hudson's excessive force claim by

recognizing that in Whitley the court recognized the "settled rule that 'the

unnecessary and wanton infliction of pain . . . constitutes cruel and unusual

punishment forbidden by the Eighth Amendment.'"  Id. at 5 (citing Whitley, 475

U.S. at 319.)  The Hudson court reiterated the Whitley evaluation standard:

> The question whether the measure taken inflicted unnecessary and
> wanton pain and suffering ultimately turns on whether force was
> applied in a good faith effort to maintain or restore discipline or
> maliciously and sadistically for the very purpose of causing harm.

---

[32] The Whitley and Hudson opinions were both authored by Justice Sandra Day
O'Connor.

Id. at 6.  The Court noted again, however, that correction officers must balance the need "to maintain or restore discipline through force against the risk of injury to inmates" and "that both situations may require . . . officers to act quickly and decisively."  Id.  The Court affirmed that "the core judicial inquiry is that set out in Whitley: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Id. at 7.  In evaluating the force alleged in an excessive force case, the Hudson court stated:

> Under the Whitley approach, the extent of injury suffered by an inmate is one factor that may suggest "whether the use of force could plausibly have been necessary" in a particular situation, "or instead evidenced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing violation that it occurred."

Id. at 7 (citing Whitley, 475 U.S. at 321.)  Hudson provided other factors to consider "in determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials' and 'any efforts made to temper the severity of a forceful response.'"  Id. (citing Whitley, 475 U.S. at 321.)  A court further must ask both if "the officials acted with a sufficiently culpable state of mind" and if the

34

alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation.[33]

The analytical structure developed in Whitley and Hudson has consistently been applied in the Eleventh Circuit. "Claims involving the mistreatment of . . . pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners." Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996). But "the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving . . . pretrial detainees." Id. The Eleventh Circuit applies Whitley and Hudson focusing on whether, in a particular case, the facts show whether force was applied in a good-faith effort to maintain or restore discipline, or whether it was used

---

[33] The former Fifth Circuit, even before Hudson, recognized that excessive force cases require a court to address the penal interests in enforcing security and compliance of those detained to allow safe and orderly administration of an institution or facility against the unreasonable use of force by guards, noting that "the use of undue force by a prison guard is actionable as a deprivation of Fourteenth Amendment due process rights." George v. Evans, 633 F.2d 413, 415 (5th Cir. 1980). The court in George affirmed the district court's decision not to give a particular "cruel and unusual punishment" instruction requested by George. In affirming the verdict in favor of defendants, the court observed that the evidence presented at trial that George was, in one encounter, hit with a night stick when defendants stated that George had failed to comply with their instructions, "did not show that the action by the guard was apparently authorized or acquiesced in by high prison officials for a penal or disciplinary purpose." Id.

35

maliciously and sadistically to cause harm.  In excessive force cases, it is axiomatic that a claim requires evidence that the official against whom the excessive force claim is asserted acted with the required intent.  See Campbell v. Sikes, 169 F.3d 1353, 1362 (11th Cir. 1999).  The Eleventh Circuit has added context to evaluate whether the conduct of a custodial official supports an excessive force claim.  In Cockrell v. Sparks, 510 F.3d 1307 (11th Cir. 2007), a pretrial detainee was pushed or shoved by a guard when the detainee created a disturbance.  Considering that a court "must give 'a wide range of deference to prison officials acting to preserve discipline and security," when considering "[d]ecisions made at the scene of a disturbance," the court found that the "amount of force conveyed by an open-handed push or shove [was] as near to the minimum amount an officer can employ, and it is not disproportionate to the need to restore order" under the circumstances of that case.[34]  Id. at 1311 (citing Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990)).[35]  The Court stated further that even though the injury suffered by the detainee "was relatively severe," there was no way the jailor "could have foreseen that a single push would result in as much injury as the detainee suffered, making it

---

[34] Bennett was post Whitley but pre-Hudson.

[35] In Bennett, a jailor's grabbing of an inmate by the throat and pushing him against the bars of his cell was not disproportionate to the need to stop the inmate from shouting and demanding to be let out.  898 F.2d at 1534.

less likely that the jailor acted "maliciously and sadistically for the very purpose of causing harm." <u>Id.</u>[36]  On these facts, the court affirmed denial of a motion to amend because, even if allowed, summary judgment would have been granted in favor of the jailor, including because the jailor's actions did not shock the conscience.  <u>Id.</u> at 1312.

In 2008, in <u>Danley v. Allen</u>, 540 F.3d 1298 (11th Cir. 2008), the court again considered whether excessive force was used against a detainee.  In <u>Danley</u>, a jailor confronting a verbally unruly detainee told him he would be sprayed if he did not get in his cell, to which the detainee asked what "spray me" meant.  The jailors responded by having a jailor spray the detainee with pepper spray for three to five seconds from a close distance.  The jailor then pushed the detainee into his small cell, which contained residue from pepper spray that had been disbursed.  The detainee had trouble breathing, said he could not breathe, and that he feared he would die.  While these complaints were made, certain jail staff laughed and mocked him by holding their throats in a "mock-choking" gesture.  Applying the analytical process set out in <u>Whitley</u>, <u>Hudson</u>, and <u>Bennett</u>, the Eleventh Circuit focused on the intent of the jailors stating: "Whether a jailor's use of force is

---

[36] The court also noted that medical aid was immediately requested to treat the detainee.

excessive, and thus violates that Fourteenth Amendment right to be free from cruel and unusual punishment, depends on whether the jailer's act 'shocks the conscience' and it necessarily will if the force was applied . . . maliciously and sadistically for the very purpose of causing harm." Id. at 1307 (citations omitted.) The court opined: "If there was nothing before us but the initial use of pepper spray following [the detainee's] second failure to obey [the] order to return to the cell, we would readily conclude that there was no Fourteenth Amendment violation." Id. The court stated further: "Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." Id. (citing Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir.1990). The court in Danley held that under the circumstances the detainee's repeated refusal to comply established the need to use force, the amount of force used – a 3-5 second burst – was reasonable, and the small extent of the injury from the pepper spray use did not support a constitutional violation. When, however, the jailors confined the detainee in a small cell, without allowing decontamination of the cell after the detainee calmed down, the court found that the jailors "did not do enough to 'temper the severity of [their] forceful response.'" Id. at 1308 (citing Whitley, 475 U.S. at 321). This, coupled with the jailors' mocking conduct, constituted a "continuation and aggravation of the initial force applied . . . after the

need for the force had ended." Id.  The conduct of the jailors after administering the initial pepper spray burst led the court to conclude that the jailors had "acted maliciously and sadistically for the very purpose of causing harm."  Id.; compare Fennell v. Gilstrap, 559 F.3d 1212 (11th Cir. 2009) (undisputed evidence did not show that correctional official kicked plaintiff maliciously and sadistically).

Finally, the Eleventh Circuit cautions that a claim of excessive force must be evaluated in the context of when the force actually was applied, for the question is whether those applying the force acted maliciously and sadistically for the very purpose of causing harm.  The court observed:

> The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and unnecessary in a strict sense.

Campbell, 169 F.3d at 1375.  As the court noted in Williams v. Burton, 943 F.2d 1572 (11th Cir. 1991), when affirming summary judgment for the defendant correctional officers, the court should afford great deference to prison officials in the force or restrain applied.  Id. at 1576.

It is against this analytical backdrop that the Court considers the conduct of Butler in this action.  The Court considers the evidence in the light most favorable to Kopperud.

Butler's involvement in the events of October 9, 2010, were limited. The facts are undisputed that he was not engaged in Kopperud's arrest and there is no evidence that he knew what had occurred involving Kopperud prior to the time Kopperud appeared in the intake area of the Jail to be processed following his arrest. When brought into the intake area, Kopperud was in handcuffs, told to stand against a plexiglass wall, and to spread his legs so he could be searched. Butler stated he first intended to remove his handcuffs. During the search process, Kopperud at least was attempting to turn his head off the wall to protest his innocence. Butler states Kopperud moved on more than one occasion while being ordered to stand against the wall. Butler's response was to use force to pin Kopperud against the wall to stop him from moving. This force was the cause of an injury Kopperud received to his forehead. At some point, Kopperud was placed in a cell and someone noticed he was bleeding. He was transported to the medical unit where he was photographed[37] and told he needed stitches. Kopperud refused to be treated at the Jail and arrangements were made to transfer him to Grady

---

[37] Kopperud stated Butler and some other officer laughed "at him" when the photographs were taken and states the pictures were taken on iPhones. There are no photographs in the record, but the Court, viewing the evidence in the light most favorable to the Plaintiff, assumes photographs were taken.

Hospital where four stitches were administered to close his wound.  He was released from the hospital to his mother.

Here, Kopperud argues that the force applied to him that caused the injury on his forehead and his claimed loss of consciousness was excessive.  The Court disagrees and finds that no reasonable juror could find in Kopperud's favor on his claim that his constitutional rights were violated.  Kopperud must present evidence that the force applied was greater than required to maintain and restore discipline and that Butler applied the force maliciously and sadistically for the very purpose of causing harm.  Considering the evidence in a light most favorable to Kopperud, the evidence does not meet either of these requirements.

First, the evidence is that Kopperud did not stand against the wall to allow a search of his person to be conducted.  Rather, the evidence is that rather than submit to the search, and assuming Kopperud's version of events only, he moved his head to the side to protest the action being taken against him.  This action was significant enough that Butler was not able to conduct the first step of removing the handcuffs from Kopperud.  It was this conduct that led Butler to the judgment that force had to be applied to Kopperud to keep him still so that the search could be completed.  That force, the Court assumes, caused Kopperud to suffer an injury on his forehead which required four stitches to close and which was administered,

at Kopperud's demand, at a facility other than the medical facility at the Jail.  This laceration was a slight injury at best and the evidence is further that once the force was applied, it resulted in Kopperud discontinuing his movement so that the search was completed.  There is no evidence of any further force after Kopperud's head was caused to impact the plexiglass wall.  The need for force, deferred to the judgment made by Butler at the time, was reasonable and the impacting Kopperud's forehead against the glass was proportional to the conduct being addressed.  The injury suffered was not significant, the need to secure Kopperud to conduct the search in a safe manner for Kopperud and the searching officers apparent, and he promptly was treated for the injury received.  Considering each of these criteria separately and collectively, the Court concludes there is no evidence to support that the force applied during the search process was committed by Butler maliciously and sadistically for the very purpose of causing harm to Kopperud.[38]

---

[38] The Court specifically has considered Kopperud's testimony that Butler and another unnamed officer took one or more photographs of Kopperud on iPhones in the medical area, where they laughed at him.  There is no evidence the photographs were not authorized or taken for a reason other than to document Kopperud's appearance at the time.  Even if Butler and the other officer did laugh, nothing was said to Kopperud about his injury and the laugh occurred well after the force was applied and does not indicate Butler's intent when Kopperud was being searched.

In reaching this conclusion, the Court applies the now well-established analytical framework set out in <u>Whitley</u>, <u>Hudson</u>, and the Eleventh Circuit cases that apply these Supreme Court precedents.  Central in all of these excessive force cases is to determine if the evidence – in this case viewed in a light most favorable to the plaintiff – shows that the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm.  <u>Hudson</u>, 503 U.S. at 6.  The further well-established principle is to evaluate the application of the force when it was applied to determine if the "use of force could plausibly have been necessary" in a particular situation "or whether it evidenced such wantonness with respect to the unjustified infliction of harm that it is tantamount to a knowing violation."  <u>Id.</u> at 7 (citing <u>Whitley</u>, 475 U.S. at 321).  In this analysis, deference is given to those responsible for preserving discipline and security.  Here, there was a single act of causing Kopperud's forehead to impact the plexiglass wall that resulted in an injury.  There was no further force applied to require Kopperud to cease his acknowledged conduct of protesting the search by moving his head to the side.  During this event, it was plausible that Butler perceived the need to apply force and there is no evidence that a person objectively would have perceived that the force would cause a head laceration that would require four stitches.  <u>Bennett</u>, 898 F.2d at 1534.  In determining whether

the use of force was wanton or unnecessary, the Court evaluated the evidence in the light most favorable to Kopperud, weighed the need for the application of force against the amount of force used, as reasonably perceived by Butler, and considered that the force was applied once without the use of any object to apply it.

The Court concludes, on the absence of a reasonable inference of wantonness in the infliction of pain on Butler's part when Kopperud suffered an injury, that Butler is entitled to qualified immunity for his conduct within his discretion in conducting the search of Kopperud.

     E.     Failure to Intervene

Kopperud asserts against Mabry a claim under Section 1983 for failing to intervene when Kopperud's Fourth Amendment rights were being violated. Kopperud argues that Mabry was required to intervene when Kopperud was being arrested for criminal trespass.  "If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation . . . takes place in his presence, the officer is directly liable under Section 1983." Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998) (citing Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986)).

Kopperud has asserted a claim for false arrest against Mabry on the grounds that Mabry had Kopperud arrested for criminal trespass without probable cause or

arguable probable cause.  Kopperud attempts to hold Mabry liable both for causing the arrest and for failing to intervene to stop the same arrest.  Plaintiff's intervention claim is required to be dismissed.

      F.     <u>State-Law Torts</u>

      1.     *Georgia Official Immunity*

Kopperud asserts against Mabry a state-law claim for false imprisonment and, against Mabry and Butler, a state-law claim for assault and battery. Defendants raise the defense of official immunity under the Georgia Constitution. "[A]ll officers and employees of the state or its departments and agencies . . . may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions."  Ga. Const. art. I, § 2, ¶ IX.  Thus, "public officials are immune from individual liability for discretionary acts undertaken in the course of their duties and without wilfulness, malice, or corruption."  <u>Schmidt v. Adams</u>, 438 S.E.2d 659 (Ga. Ct. App. 1993).

> This official immunity is intended to protect public officials in the honest exercise of their judgment, however erroneous or misguided that judgment may be. "Otherwise, not only would it be difficult to get responsible men to fill public office, but there would be constant temptation to yield officially to unlawful demands, lest private liability be asserted and enforced."

<u>Id.</u> at 660 (quoting <u>Price v. Owen</u>, 19 S.E.2d 529, 531 (Ga. Ct. App. 1942)).

"Actual intent to cause injury" has been defined in the tort context to mean "an

actual intent to cause harm to the plaintiff, not merely an intent to do the act

purportedly resulting in the claimed injury. . . . This definition of intent contains

aspect of malice, perhaps a wicked or evil motive." Kidd v. Coates, 518 S.E.2d

124, 125 (Ga. 1999) (citations and quotation marks omitted). "Unlike qualified

immunity under federal law, we must inquire into [the public official's] subjective

intent to determine whether he has official immunity under Georgia law." Jordan

v. Mosley, 487 F.3d 1350, 1357 (11th Cir. 2007).

### 2. *False Imprisonment*

Kopperud alleges that Mabry caused Kopperud to be arrested even though

he was aware, or should have been aware, that Kopperud had not committed a

crime. Under Georgia law, "[l]ack of probable cause shall exist when the

circumstances are such as to satisfy a reasonable man that the accuser had no

ground for proceeding but his desire to injure the accused." O.C.G.A. § 51-7-3.

"[T]he question is not whether every element of the crime had been established

before the arrest was made, but whether there is any evidence [the defendant] acted

only with a desire to harm [the arrestee]." Amason v. Kroger Co., 420 S.E.2d 314,

316 (Ga. Ct. App. 1992).

For the reasons stated earlier in this Order, the facts regarding Kopperud's

arrest, and the crime for which he was arrested, are significantly disputed and these

46

issues are required to be resolved by the jury.  For these reasons, Mabry's motion to dismiss the claim for false imprisonment is denied at this stage of the litigation.

        3.    *Assault and Battery*

Kopperud asserts a claim of assault and battery against both Mabry and Butler.  Kopperud argues that Mabry is liable because he caused Kopperud to be arrested without probable cause.  See Corporate Prop. Investors v. Milon, 549 S.E.2d 157, 163 (Ga. Ct. App. 2001) (police officer could be liable for committing an assault and battery by making an illegal arrest) (citing Napper v. State, 38 S.E.2d 269 (Ga. Ct. App. 1946)).  For the reasons discussed above, Mabry is not entitled to official immunity from Kopperud's tort claims.

Kopperud argues that Butler is liable because he used excessive force to subdue Kopperud during the search inside the Jail.  Kopperud argues that the following evidence demonstrates that Butler acted with actual malice: (i) Butler failed to report Kopperud's injuries in the incident report Butler completed, an omission for which Butler was disciplined; (ii) Butler's statements to the FBI that Butler applied force to Kopperud's head are inconsistent with his deposition testimony that he applied force only to Kopperud's back, and that this inconsistency suggests that Butler attempted to "cover-up" his conduct; and (iii) Butler laughed at Kopperud after he was injured.

Kopperud's evidence with respect to Butler's subjective motivation is thin. The Court concludes Kopperud has not presented sufficient evidence to allow a reasonable jury to conclude that Butler acted with malice.  Butler is therefore entitled to summary judgment on the assault and battery claim on the basis of official immunity.  Butler's motion for summary judgment on this claim is granted.

## III.   CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants Dexter Mabry and Damien Butler's Motion for Summary Judgment [51] is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's claim under Section 1983 for excessive use of force asserted against Butler is **DISMISSED**.  Plaintiff's claim under Section 1983 for false arrest asserted against Butler is **DISMISSED**.  Plaintiff's claim under Section 1983 for failure to intervene asserted against Mabry is **DISMISSED**. Plaintiff's claim for assault and battery against Butler is **DISMISSED**.

**IT IS FURTHER ORDERED** that Defendant Butler is **DISMISSED** from this action.

**IT IS FURTHER ORDERED** that the parties' Consolidated Consent Motion for Limited Discovery [50] is **GRANTED**.  The parties agreed to conduct additional depositions only if the Court permitted Plaintiff's false arrest claim to

proceed.  The discovery deadline thus is extended for the limited purpose of conducting those additional depositions.  These additional depositions shall be concluded on or before February 14, 2014.

**SO ORDERED** this 17th day of December, 2013.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE